IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| AMERICAN MULTI-CINEMA, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 06 C 0063 |
| | ) | Judge Blanche M. Manning |
| MCL REC, LLC and | ) | |
| INTERCONTINENTAL RIVER EAST, | ) | |
| LLC. | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

Cross-claim defendant MCL REC, L.L.C. ("MCL") moves for summary judgment against cross-claim plaintiff Intercontinental River East, L.L.C. ("Intercontinental"). In addition, Intercontinental seeks to strike portions of MCL's Local Rule 56.1 statement. For the reasons stated below, the motion for summary judgment is granted in part and denied in part and Intercontinental's motion to strike is denied.

**I.  Facts**[1]

*General Background*

American Multi-Cinema, Inc. ("AMC") is a Missouri corporation in the business of theatrical film exhibition. In July 1999, AMC leased retail space at the River East Center in Chicago. From April 2004 to January 8, 2006, AMC's landlord at River East was MCL REC, L.L.C. ("MCL"). On January 9, 2006, MCL sold the River East property to cross-claimant Intercontinental, which then became AMC's landlord.

---

[1] The court notes that MCL filed a bound document including its statement of uncontested facts with relevant exhibits attached behind the statement of facts. *See* Dkt. #64. MCL, however, failed to provide a tabbed version of this bound document and also failed to provide an index to the attached exhibits as required under Local Rule 5.2(c). While such details may seem insignificant to a party, they are critical to this court's ability to quickly locate documents and, indeed, can directly hinder the court's ability to provide a speedy resolution to the motion pending before it.

The instant dispute surrounds who must pay for the hot and cold water used by AMC. The hot and cold water provided to the retail tenants in the River East Center, including AMC, is produced by a central system that is owned by Embassy Suites Hotel ("Hotel"). The retail tenant's landlord pays a monthly charge to the Hotel for the hot and cold water that is produced by the central system and delivered to the retail tenants, including AMC. The landlord then sends monthly invoices to the retail tenants for their respective hot and cold water usage.

AMC disputes its obligation to pay its hot and cold water charges, and made payments to MCL under protest. The dispute about the payment of hot and cold water charges has spawned at least two separate lawsuits and several claims, counterclaims and cross-claims as described below.

*Litigation Regarding the Water Charges*

AMC initiated this diversity action on January 6, 2006, by filing a one-count complaint for declaratory judgment against MCL regarding interpretation of the AMC lease.[2] Specifically, AMC's lawsuit seeks a judicial determination that Section 12(A) of its lease does not require it to separately pay for its hot and cold water charges. MCL filed a counterclaim against AMC alleging that while it was AMC's landlord, it regularly paid for hot and cold water. The counterclaim alleges that despite repeated demands by MCL, AMC failed to pay the invoices for such charges as issued by MCL, requiring MCL to declare AMC in default before it would tender payment. AMC ultimately paid MCL over $340,000 as "payments under protest" for the hot and cold water invoices from MCL.

On January 9, 2006, MCL sold certain property at Chicago's River East Center to Intercontinental ("Sale"); so, on that date, Intercontinental became AMC's landlord at the River East Center. The Sale was accomplished pursuant to a written Agreement of Purchase and Sale ("Sale

---

[2] Westwacker, the initial landlord who ultimately sold River East Center to MCL, had previously filed a lawsuit against AMC seeking $233,340.33 plus fees and costs in unpaid hot and cold water charges. That suit by Westwacker, case no. 05 C 7042, was consolidated with the instant case and has settled.

Agreement"). Intercontinental did not become a party to the lease with AMC until the closing occurred on January 9, 2006. Since being assigned the lease on that date, Intercontinental has taken the position, like MCL, that AMC is obligated to pay a separate charge for hot and cold water pursuant to the lease with AMC. In that vein, Intercontinental has issued invoices to AMC pursuant to the lease for AMC's monthly utility charges, but AMC has refused to pay. While Intercontinental inherited the lease with AMC from MCL when it purchased the River East Center, MCL did not tell Intercontinental how to interpret the lease and, in fact, Intercontinental reviewed the lease and made its own interpretations as to what the lease means.

On February 1, 2006, more than three weeks after the closing date of the sale, AMC filed its First Amended Complaint, reasserting its prior claims against MCL and adding a claim for declaratory judgment on the same basis against Intercontinental. On March 30, 2006, Intercontinental filed its answer, affirmative defenses and cross-claim against MCL. The cross-claim seeks indemnification and to be held harmless as well as an award of attorneys' fees, expenses, and costs it incurs in defending against AMC's First Amended Complaint pursuant to an indemnification provision in the Assignment of Leases and Section 9.5 of the Sale Agreement.

On August 28, 2006, Intercontinental filed a counterclaim against AMC seeking damages that include unpaid hot and cold water charges.

*Relevant Contract Provisions*

The interpretation of several contractual provisions are at issue in this case. These provisions are set forth below. First, as already noted, MCL assigned the AMC Lease to Intercontinental pursuant to a written Assignment of Leases, which was an exhibit to the Sale Agreement. The Assignment of Leases included the following language, pursuant to which MCL was the Assignor and Intercontinental was the Assignee:

> Assignor hereby agrees to indemnify, defend and hold Assignee harmless from and against any and all claims, demands, liabilities and/or obligations to the extent arising out of or accruing pursuant to the Leases and Service Contracts prior to the Closing Date . .

Furthermore, Section 9.5 of the Sale Agreement states:

> If either party hereto fails to perform any of its obligations under this Agreement or if any dispute arises between the parties hereto concerning the meaning or interpretation of any provision of this Agreement, whether prior to or after Closing, or if any party defaults in payment of its post-Closing financial obligations under this Agreement, then the defaulting party or the party not prevailing in such dispute, as the case may be, shall pay any and all costs and expense incurred by the other party on account of such default and/or in enforcing or establishing its rights hereunder, including, without limitation, court costs and reasonable attorneys' fees and disbursements.

Section 3.2 of the Sale Agreement describes "Exception Matter." Specifically, it states in relevant part:

> the term "Exception Matter" shall refer to a matter, (i) which makes a representation or warranty of Seller contained in this Agreement untrue or incorrect and (ii) which is disclosed to Buyer by written notice from Seller or is otherwise discovered by Buyer before the Closing. If Buyer first obtains actual knowledge of any material Exception Matter prior to Closing, Buyer's sole remedy shall be to terminate this Agreement and obtain a return of the Deposit .... Seller shall have no obligation to cure or remedy any Exception Matter, even if Seller has notified Buyer of Seller's election to attempt to cure or remedy any Exception Matter, and, subject to Buyer's right to terminate this Agreement as set forth above and obtain a return of the Deposit, Seller shall have no liability whatsoever to Buyer with respect to any Exception Matters....If Buyer obtains actual knowledge of any Exception Matter before the Closing, but nonetheless elects to proceed with the acquisition of the Property, Seller shall have no liability with respect to such Exception Matter, notwithstanding any contrary provision, covenant, representation or warranty contained in this Agreement or in any Other Document.

Finally, Section 3.6(b) of the Sale Agreement provides, in part, that:

> EXCEPT FOR SELLER'S REPRESENTATIONS, WARRANTIES AND COVENANTS SET FORTH HEREIN AND/OR IN OTHER DOCUMENTS…BUYER IS NOT RELYING ON ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND WHATSOEVER, EXPRESS OR IMPLIED, FROM SELLER, ANY SELLER RELATED

> PARTIES, OR THEIR AGENTS OR BROKERS, OR ANY OTHER PERSON ACTING OR PURPORTING TO ACT ON BEHALF OF SELLER, AS TO ANY MATTERS CONCERNING THE PROPERTY, INCLUDING WITHOUT LIMITATION: (x) the Leases, Service Contracts, or other documents or agreements effecting the Property, or any information contained in any rent roll furnished to Buyer for the Property."

*Disclosure of the AMC-MCL Dispute*

Jim Bradley ("Bradley") is the head counsel for Intercontinental and was involved in the due diligence associated with Intercontinental's acquisition of the River East Center from MCL. Bradley was also involved in the January 9, 2006, closing of Intercontinental's acquisition of the River East Center from MCL.

On or about January 6, 2006, three days before the closing of Intercontinental's acquisition of the River East Center from MCL, Bradley received a letter from MCL's counsel, Richard Traub ("Traub"), forwarding some papers from MCL's file regarding the hot and chilled water dispute with AMC. The packet contained correspondence between AMC and MCL "regarding the hot and chilled water dispute with AMC in connection with" the River East Center. These letters included an August 17, 2005, letter and a December 12, 2005, letter from AMC's counsel indicating that AMC was paying all of its overdue heated and chilled water charges in a total amount of $347,943.22 "under protest." MCL contends that it forwarded the "entire file" regarding this dispute to Bradley; however, Intercontinental denies this characterization. During his deposition, Traub indicated that he did not know if Bradley had ever received the correspondence in the packet prior to January 5, 2006.

Joseph Sweeney, an asset manager for Intercontinental and its designated 30(B)(6) deposition witness, stated during his deposition that Intercontinental was aware that there were some disagreements over payment of the hot and chilled water bills, but knew that the bills had been paid. Sweeney also testified in that context that "tenants complain about payments on stuff all the time."

Sweeney Dep. at 37, ll. 5-6. Sweeney's "best" recollection was that he saw some documents relating to the hot and cold water dispute in the packet received on January 6, 2006 from MCL.

Daniel McLean, President of MCL, testified that as of December 12, 2005, AMC had paid up and was current with all its heated and chilled water charges at that time.[3] McLean did not know whether Intercontinental ever reviewed the hot and cold water correspondence between MCL and AMC when MCL made due diligence documents available to Intercontinental. McLean never personally shared nor instructed anyone at MCL to share this correspondence with Intercontinental. However, McLean testified that he personally discussed MCL's dispute with AMC regarding payment for hot and cold water with Intercontinental's President, Peter Palandjian, and that McLean disclosed to Palandjian that AMC "was disputing the way the utility was being handled." McLean dep. at 29.

MCL's Senior Vice President, Charles Landefeld, did not know if the hot and cold water dispute between Westwacker and AMC (the lawsuit which was filed prior to the Closing Date) was disclosed to Intercontinental prior to the Closing Date.

MCL's Lori Schreiber was the MCL representative in charge of the document reviews performed by Intercontinental prior to the Closing. Schreiber took certain Intercontinental representatives on tours of the property prior to the Closing date. She did not recall whether she ever

---

[3] While Intercontinental asserts in its statement of facts that McLean believed that the AMC dispute was resolved prior to Closing, the referenced testimony does not support that position. Indeed, in the cited testimony, while discussing a November 17, 2005, letter from MCL to AMC (which the parties do not appear to have included in their submissions to the court despite addressing the testimony surrounding that letter), Intercontinental asks "[h]ad you disclosed that to Intercontinental, that you were threatening the cutoff of the heat[ed] and chilled water. . . .?" McLean responds, "I disclosed the problem. We thought it was –as this letter indicates, we thought we had finally got a resolution on this problem. And for whatever reason, AMC chose to totally turn around and ignore the solution that we – they had gotten to the point of acknowledging they owed all this money; then they for whatever reason decided that, maybe because they had leverage because there was a sale going on, that they were going to fight some more." McLean Dep. at pp. 45-46. Later, when asked if as of December 12, 2005, the dispute was still "alive," McLean responded that "It wasn't settled, so I guess that means it was alive, yes. Well, it was alive in such that as far as I was concerned they paid up and we were current with what they owed us. They were still reserving their rights to dispute it, but they had actually paid all of the money that was due and owing up that point in time." *Id*. at 48.

discussed the AMC hot and cold water dispute with Intercontinental during one of those tours. She also did not remember how many document reviews occurred, when they occurred, or who attended on behalf of Intercontinental.

Diane Schulte is the Senior Vice president of Properties for AMC Realty and the Vice president of Properties for AMC, Inc., and her job duties include overseeing the company's leases and fee properties. Schulte is the AMC employee who is responsible for making the decision to pay or not pay the heated and chilled water invoices sent to AMC by Intercontinental. Schulte did not believe that anyone at AMC had discussions with anyone at Intercontinental prior to the Closing Date regarding the hot and cold water issues.

## II. Summary Judgment Standard

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The existence of a factual dispute is not sufficient to defeat a summary judgment motion, instead the non-moving party must present definite, competent evidence to rebut the movant's asserted facts. *Butts v. Aurora Health Care, Inc.*, 387 F.3d 921, 924 (7th Cir. 2004).

## III. Analysis

A. <u>Can Intercontinental raise an indemnification claim?</u>

As noted above, after the sale from MCL to Intercontinental, AMC amended its complaint to add Intercontinental as a defendant in its declaratory judgment action. Intercontinental's cross-claim against MCL alleges that "with respect to AMC's claims . . . and its defense against AMC's claims" it "is entitled to be indemnified and held harmless by MCL pursuant to the indemnification provision executed and made part of the Agreement of Purchase and Sale between MCL and Intercontinental." Cross-claim, Dkt. #22, ¶ 15 at page 7. That indemnification provision reads as follows:

> Assignor hereby agrees to indemnify, defend and hold Assignee harmless from and against any and all claims, demands, liabilities and/or obligations to the extent arising out of or accruing pursuant to the Leases and Service Contracts prior to the Closing Date . . . .

MCL asserts that Intercontinental cannot seek relief under the indemnification provision. According to MCL, "[t]o prevail under the [indemnification] provision, for either defense or indemnity, Intercontinental would need to be sued for a claim arising 'prior to the Closing Date.'" MCL concludes that since the only "claim" against Intercontinental is one for declaratory judgment regarding the interpretation of the provisions of the AMC lease, to which Intercontinental did not become a party until the closing, then the claim could not have arisen "prior to the Closing Date" as provided in the indemnification provision. In support, MCL cites to Sweeney's Rule 30(b)(6) deposition testimony which admits that AMC's declaratory judgment action against Intercontinental did not arise until after the closing date.[4]

"The ultimate purpose of indemnification is to 'shift[ ] the entire responsibility from the party who has been compelled to pay the plaintiff's loss to another who actually was at fault.'" *BCS Ins. Co.*

---

[4] In its motion to dismiss, the court noted that the issue of indemnification was premature given that there had been no ruling in the underlying action between AMC and MCL/Intercontinental. See Dkt. #37-1, Case No. 05-7042. However, consideration of Intercontinental's request for defense costs under this provision is ripe and the issues of indemnification and defense require consideration of the same evidence. The court will thus decide them at the same time. *See City of Chicago v. Arvinmeritor Inc.*, No. 05 C 6738, 2006 WL 3431910, at *6 (N.D. Ill. Nov. 28, 2006)(given court's interest in judicial economy and fact that underlying action was pending before that court as opposed to a state court, court would consider the duty to indemnify claim along with the duty to defend).

*v. Guy Carpenter & Co., Inc.*, 490 F.3d 597, 603 (7th Cir. 2007)*(quoting Kerschner v. Weiss & Co.*, 282 Ill. App. 3d 497, 217 Ill. Dec. 775, 667 N.E.2d 1351, 1355 (1996)). Generally, a request for indemnification may make most sense in the context of a tort claim where there may be a party "at fault." S*ee, e.g., Foskett v. Great Wolf Resorts, Inc*., — F.3d — , 2008 WL 585032 (7th Cir. March 5, 2008).

Here, however, MCL (the original landlord) and Intercontinental (the landlord post-closing) have independently interpreted the relevant lease provision under which they seek to hold AMC liable for hot and cold water charges. If AMC succeeds on its declaratory judgment action against MCL and Intercontinental as to the interpretation of the lease provision, then MCL and Intercontinental will be held responsible only to the extent that each was a party to the lease. In other words, Intercontinental will only be liable for hot and cold water charges that AMC incurred *after* the Closing Date, when Intercontinental became the owner of the property. *See* AMC's First Amended Complaint, Dkt. # 8-1, at ¶¶ 10 and 11 ("10. Defendant MCL was a successor in interest to River East, L.L.C. under the Lease and defendant MCL was, *during its period of ownership of the Project*, AMC's 'Landlord' under the Lease" and "11. *Intercontinental is the current 'Landlord' under the Lease* (having succeeded to the interest of defendant MCL under the Lease) and AMC continues to be the tenant under the Lease")(emphasis added).

Thus, Intercontinental cannot establish that a liability or obligation *on its part* stemming from AMC's successful prosecution of its declaratory judgment action "arose out of or accrued" pursuant to the lease *prior* to the Closing Date, as the indemnification provision requires.[5] The court, therefore,

---

[5] The parties do not discuss the choice of law issue; however, the court will apply Illinois law given that the Sale Agreement states that the "Agreement shall be governed by and construed in accordance with the internal laws of the State of Illinois." Sale Agreement, Intercontinental Exh. E-30, Section 9.8. Under Illinois law, the court's task in interpreting the contract "start[s] with the old saw that [it] begin[s] [its] analysis with the language of the contract itself. If the language unambiguously answers the question at issue, the inquiry is over." *Emergency Medical Care, Inc. v. Marion Memorial Hosp*., 94 F.3d 1059, 1061 (7th Cir. 1996)(citations omitted).

concludes that Intercontinental may not seek indemnification in connection with AMC's declaratory judgment action against it. Accordingly, MCL's motion for summary judgment as to the indemnification provision is granted.

B.      <u>Does the Sale Agreement bar Intercontinental from seeking any relief from MCL?</u>

As noted above, Section 3.2 of the Sale Agreement provides as follows:

> **Section 3.2    No Liability for Exception Matters**
>
> As used herein, the term "Exception Matter" shall refer to a matter, (i) which makes a representation or warranty of Seller contained in this Agreement untrue or incorrect and (ii) which is disclosed to Buyer by written notice from Seller or is otherwise discovered by Buyer before the Closing. If Buyer first obtains actual knowledge of any material Exception Matter prior to Closing, Buyer's sole remedy shall be to terminate this Agreement and obtain a return of the Deposit . . . . If Buyer obtains actual knowledge of any Exception Matter before the Closing, but nonetheless elects to proceed with the acquisition of the Property, Seller shall have no liability with respect to such Exception Matter, notwithstanding any contrary provision, covenant, representation or warranty contained in this Agreement or in any Other Document.

MCL argues that Intercontinental's cross-claim against it is barred by the express terms of Section 3.2.[6] MCL's argument contains several steps. First, MCL concedes that it failed to formally disclose AMC's material defaults under the AMC Lease as required in Section 3.1(e) of the Sale Agreement and failed to formally disclose that there was threatened litigation between AMC and MCL

---

[6]Intercontinental argues that MCL's reliance on Section 3.2 should have been pled as an affirmative defense, and, because it was not, it was waived. Under Fed. R. Civ. P. 8(C), "[i]n responding to a pleading, a party must affirmatively state any avoidance or affirmative defense, including: accord and satisfaction; arbitration and award; assumption of risk; contributory negligence; discharge in bankruptcy; duress; estoppel; failure of consideration; fraud; illegality; injury by fellow servant; laches; license; payment; release; res judicata; statute of frauds; statute of limitations; and waiver." If a party fails to raise an affirmative defense at the time it answers the complaint, the defense is deemed waived. *Castro v. Chicago Housing Authority*, 360 F.3d 721 (7th Cir. 2004). Intercontinental, however, fails to cite any caselaw in support of its argument that Section 3.2 of the Sale Agreement should have been raised as an affirmative defense. Given that MCL's reliance on Section 3.2 would be a non-enumerated affirmative defense, if at all, and that such a determination could require a nuanced analysis to ascertain whether it indeed constitutes an affirmative defense, the court concludes that Intercontinental has forfeited this argument, at least with respect to the instant motion for summary judgment.

as required in Section 3.1(g) of the Sale Agreement.  MCL also concedes that under Section 3.2(i), the existence of these defaults and threatened litigation and its failure to formally disclose them makes its representations and warranties under Sections 3.1(e) and 3.1(g) untrue or incorrect.  MCL then asserts that its failure to formally disclose the defaults and the threatened litigation are not actionable because Intercontinental knew about these issues prior to closing.  Specifically, MCL contends that Intercontinental knew about the defaults and threatened litigation prior to the Closing Date as required by Section 3.2(ii), so the defaults and threatened litigation are "Exception Matter" pursuant to Section 3.2.  Section 3.2 provides as Intercontinental's "sole remedy" the right to terminate the Sale Agreement and recover its deposit.  MCL then notes that Intercontinental did not terminate and instead proceeded with the purchase.  MCL thus concludes that by doing so, Intercontinental waived its "sole remedy" to terminate the contract as to MCL.  Based on this reasoning, MCL argues that Intercontinental's cross-claim for defense and indemnification must fail.

Intercontinental responds that Section 3.2 requires that it have "actual knowledge" of any material defaults or threatened litigation and because it did not have actual knowledge of either, Section 3.2 is inapplicable.

"Actual knowledge is distinct from constructive knowledge." *In re County Treasurer*, 707 N.E.2d 60, 64-65 (Ill. App. Ct. 1998)(citations omitted).  Black's Law Dictionary defines "actual" as something real in opposition to that which is constructive or speculative. Black's Law Dictionary 888 (8th ed. 2004).  Constructive knowledge, on the other hand, is defined as "knowledge that one using reasonable care or diligence should have, and therefore that is attributed by law." *Id*.; *U.S. v. One Parcel of Land Located at 7326 Highway 45 North, Three Lakes, Oneida,* 965 F.2d 311, 315-16 (7th Cir. 1992)(noting that statutory provision at issue required "actual" knowledge as opposed to what claimant should have known.).

As an initial matter, while the parties discuss disclosure of material defaults, neither points to any evidence that a material default existed as of the Closing Date that should have been (and was not) disclosed in the Sale Agreement such that Section 3.2 of the Sale Agreement would come into play. Indeed, the evidence shows that both parties believed AMC to have fully paid its charges for hot and cold water. *See* Sweeney dep. at 37 ("We were aware that there was some disagreement over payment of the hot and chilled water bills, but we also knew that they were paid."); McLean dep. at 48 ("They were still reserving their rights to dispute it, but [AMC] actually had paid all the money that was due and owing up to that point in time."). As such, the court will confine itself to an analysis of whether Intercontinental had actual notice of threatened litigation despite MCL's failure to disclose it pursuant to Section 3.1(g) of the Sale Agreement.

The parties discuss two main points at which Intercontinental could have received actual notice of the hot and cold water dispute. The first is Schedule 3 of the Sale Agreement, which includes a list of any pending or threatened litigation. It is undisputed that the hot and cold water dispute between MCL and AMC was not included where it should have been on this Schedule, even though there was a mention on another part of the Schedule of a dispute between MCL and the *Hotel,* not AMC. MCL admits in its reply brief that Schedule 3 did not provide notice of the hot and cold water dispute. *See* Reply at 6 ("regardless of the fact that Schedule 3 of the Sale Agreement failed to disclose the dispute. . . ."). *See also* MCL's Local Rule 56.1(a)(3) Statement of Facts, paragraph 40 ("MCL did not disclose its dispute with AMC regarding the interpretation of the Lease on Schedule 3 of the Sale Agreement."). Accordingly, the court need not address this possible avenue of disclosure any further.[7]

---

[7] The court notes, however, that even assuming the Schedule 3 disclosures were at issue, it would not be persuaded by Intercontinental's attempt to malign MCL for relying on Section 3.2 of the Sale Agreement. In particular, Intercontinental argues that "[i]ncredibly, despite its false and deceptive disclosure [on Schedule 3] in the [Sale] Agreement, MCL now asks this Court to condone and reward its behavior by allowing it to rely on Section 3.2 of the [Sale] Agreement to avoid its duty to defend and to indemnify." With certain qualifications, Section 3.2 appears to allow MCL to avoid liability for untrue or incorrect representations it made in the Sale Agreement if Intercontinental had actual knowledge of

The second point at which Intercontinental could have obtained actual notice of the hot and cold water dispute was in the packet of information that Jim Bradley, Intercontinental's head counsel, received on January 6, 2006, three days before the Closing Date, from MCL's counsel, Richard Traub. It is not entirely clear from the parties' statement of facts and responses thereto exactly what was contained in this packet. However, it is undisputed that this packet of information included at least a cover letter dated January 5, 2006, stating "Enclosed please find copies of correspondence from our file regarding the hot and chilled water dispute with AMC in connection with the above-captioned site." The packet also included an August 17, 2005, letter from AMC's counsel to MCL enclosing a $300,000 check which was "to be applied to the invoices for heated and chilled water." The August 17, letter further notes that "payment to MCL REC, LLC is being made 'Under Protest,'" in that "[i]f it is determined that this charge was not payable by AMC pursuant to its Lease, or if the enclosed check exceeds the amount payable by AMC under the Lease, AMC reserves the right to offset the overpayment against subsequent installments of rent payable under the Lease."

In addition, the packet included a December 12, 2005, letter, which was sent less than a month before the Closing Date, from AMC to MCL. It disputes MCL's position that AMC has defaulted under the lease by failing to pay for hot and cold water and encloses another check "under protest" for the outstanding amount of $47,943.22. It goes on to state that:

> This letter will also serve as AMC's notice to you pursuant to Article 34(B) of the AMC Lease that AMC disputes the alleged default in your December 2, 2005, letter and reserves the right to exercise any of its rights and remedies under Article 34(B) of the AMC Lease, in addition to any and all other rights and remedies available to AMC under the AMC Lease, and at law and in equity.

---

that incorrect or untrue representation. The court can hardly fault MCL for relying on a contract provision that was negotiated and agreed to by the parties. If Intercontinental did not want MCL to rely on the provision it should have either negotiated it out of the contract or not signed the Sale Agreement.

> Further, this letter will be deemed to revoke any and all prior settlement offers made by AMC (or its attorneys or agents) with respect to the hot and chilled water expenses dispute.
>
> Finally, AMC has informed me that they would consider submitting the hot and chilled water expenses dispute to mediation, provided a "stand still" agreement is agreed upon by you and AMC.

MCL points to the above-described correspondence in an attempt to demonstrate that "[i]t is . . . indisputable that Intercontinental did, in fact, receive actual notice of the existence of a material dispute between AMC and MCL regarding payment for heated and chilled water prior to the Closing and that the dispute was serious enough to constitute an Exception Matter."

The court finds the Seventh Circuit's opinion in *Frey v. Fraser Yachts*, 29 F.3d 1153 (7th Cir. 1994), instructive. In that case, unbeknownst to the seller, a yacht broker had also acted as a broker for the buyer. After the sale, the seller sued the broker and his company for breach of fiduciary duty and an accounting. The district court granted summary judgment to the defendants concluding that because Frey's lawyer knew about the broker's commission from the buyer, such knowledge could be imputed to Frey. The Seventh Circuit reversed and remanded noting that a broker can only act as a representative for both the buyer and seller when both parties are "fully aware of such dual representation and consent to it." *Id*. at 1156 (citations omitted).

The Seventh Circuit rejected the defendants' argument that a letter sent by Frey to the broker that referred to the buyers as "your clients" constituted proof of Frey's actual knowledge of the dual representation. After noting that Frey had testified that he used the term "your clients" to refer to the Flynns as the buyers, "not that [the broker] represented them," the Seventh Circuit concluded that:

> There are many possible inferences one could draw from Frey's description of the Flynns as McCarvill's "clients," and although a jury might question Frey's choice of words, the inference most favorable to Frey is that he was merely referring to the individuals McCarvill had produced as potential buyers. Therefore, Frey's letter does not conclusively prove that Frey had *actual knowledge* of McCarvill's dual representation.

*Id*. at 1157 (emphasis added).

The defendants in *Frey* also attempted to rely on a statement by the boat inspector that Frey told him that McGarvill represented the Flynns. Specifically, the boat inspector stated that Frey told him that the broker was "'the broker offering [the yacht] in trade.'" The Seventh Circuit found "[the boat inspector's] testimony is simply not definite or unambiguous enough to support summary judgment for the defendants on the grounds that Frey *actually knew* McCarvill represented the Flynns, especially in light of Frey's denial that he made the statement." *Id*. at 1158 (emphasis added). The Seventh Circuit ultimately concluded that "[a]t the very least, there is a genuine issue of material fact as to Frey's actual knowledge." *Id.*

Here, genuine issues of material fact exist for much the same reasons.[8] While MCL points to the letters that were sent to Intercontinental regarding the water dispute which it believes establishes actual knowledge, Intercontinental's 30(b)(6) witness, Joseph Sweeney, testified that he believed the letters represented a typical tenant complaint and that it was his understanding that all of the outstanding bills had been paid. As in *Frey*, Sweeney's testimony raises a genuine issue of material fact as to whether Intercontinental had actual knowledge of pending or threatened litigation. *See Quickie Mfg. Corp. v. Libman Co.*, No. 04-2229, 2008 WL 630633, at *2 (C.D. Ill. March 2, 2008)(in patent case where actual knowledge of prior art had to be proved in order to show inequitable conduct, summary judgment was denied and the trier of fact had to assess the credibility of the witnesses where patent applicants and prosecution attorney testified they did not know of the prior art and the plaintiff's president disclaimed knowledge of the prior art even though his father had been granted some of the undisclosed patents). Therefore, MCL's motion for summary judgment based on Section 3.2 of the Sale Agreement is denied.

---

[8] Notably, MCL fails to cite any caselaw in support of its position that the letters provided "actual notice" of threatened litigation between AMC and MCL as a matter of law. Moreover, in its reply, MCL fails to distinguish the *Frey* case even though it is featured prominently in Intercontinental's response.

C. <u>Intercontinental's Reliance on Section 9.5</u>

MCL also seeks summary judgment as to Intercontinental's reliance on Section 9.5 of the Sale Agreement, which states:

> If either party hereto fails to perform any of its obligations under this Agreement or if any dispute arises between the parties hereto concerning the meaning or interpretation of any provision of this Agreement, whether prior to or after Closing, or if any party defaults in payment of its post-Closing financial obligations under this Agreement, then the defaulting party or the party not prevailing in such dispute, as the case may be, shall pay any and all costs and expense incurred by the other party on account of such default and/or in enforcing or establishing its rights hereunder, including, without limitation, court costs and reasonable attorneys' fees and disbursements.

According to MCL, Intercontinental cannot seek payment of costs under this section because it cannot present any evidence of breach, default or failure to perform by MCL. But MCL's argument completely reads out a portion of the above provision. Specifically, Section 9.5 states that if either party fails to perform "*or if any dispute arises between the parties hereto concerning the meaning or interpretation of any provision of this agreement* . . . then the defaulting party or the party not prevailing in such dispute, . . ., shall pay any and all costs and expense by the other party. . . ." Clearly, as evidenced by this memorandum and order, the parties dispute the interpretation of certain provisions of the Sale Agreement. Thus, even if Intercontinental could not show default or failure to perform on MCL's part, it cannot be disputed that there is a disagreement at least as to the interpretation of the indemnification provision and Section 3.2. Therefore, MCL's motion for summary judgment as to Section 9.5 on the ground that Intercontinental has failed to show failure to perform or default is denied.

E. <u>Are there quantifiable damages such that Intercontinental can seek indemnification?</u>

Finally, MCL seeks summary judgment as to Intercontinental's indemnification claim against it on two other grounds. First, it argues that since its own interpretation of the lease with AMC regarding the payment of hot and cold water did not have any bearing on how Intercontinental chose

Page 16

to interpret the lease, then it would be "inequitable" to require MCL to indemnify Intercontinental for its interpretation.[9] In its reply, MCL goes on to contend that "[u]nder this perverse scenario, there is no incentive for Intercontinental to be reasonable in its interpretation of the Lease, nor is there any incentive to settle the case based on a negotiated resolution." According to MCL, Intercontinental has no reason to negotiate in good-faith with AMC because it can simply persist in its own interpretation of the lease (i.e., that AMC must pay for the hot and cold water) knowing that if the court rules against it, then it can simply pass along the "damages" to MCL under the indemnification provision.

As an initial matter, this argument is unpersuasive because both MCL and Intercontinental took the same position that AMC was required to pay separately for hot and cold water charges. Thus, if Intercontinental's interpretation of the lease is unreasonable, then so was MCL's. Second, while MCL takes issue with the indemnification provision as a matter of public policy because of the indemnitee's purported misguided motivations, MCL points to no evidence indicating that it did not enter into this contract freely and willingly and after thorough negotiations by its attorneys. If MCL did not like the provision, it should not have signed the Sale Agreement. Finally, and perhaps most importantly, MCL has cited no caselaw or authority whatsoever in support of its argument regarding the alleged inequity of the provision. In any event, the court has already concluded that Intercontinental cannot rely on the indemnification provision in this instance, so parsing the indemnification clause further does not advance MCL's position.

MCL also argues that because AMC's claim for declaratory relief against Intercontinental does not seek monetary relief, there is no basis for requiring MCL to indemnify Intercontinental. In other

---

[9] In a related argument, MCL contends that because Intercontinental agreed under Section 3.6 of the Sale Agreement that it was not relying on any other representations or warranties by MCL except those made in the Section 3.1 of the Sale Agreement, and Section 3.1 contains no representation regarding the interpretation of the AMC lease, then Intercontinental cannot seek indemnification. The court need not rule on this argument as it has already concluded that Intercontinental cannot rely on the indemnification provision. Nevertheless, the court finds this argument to be without merit as Intercontinental's attempt to rely on the indemnification provision was not based on a purported representation made by MCL.

words, MCL's argument goes, because a ruling on AMC's declaratory judgment action will not lead to any quantifiable damages, Intercontinental's claim for indemnification must fail. As an initial matter, MCL fails to support this argument with any citation to authority. Moreover, as noted by Intercontinental, the "damages" it will suffer are the hot and cold water charges (purportedly over $600,000 worth) that Intercontinental has already paid and will be responsible for. In any event, as with the previous argument, the court need not rule on this argument given that it has already concluded that Intercontinental cannot rely on the indemnification provision.

## III. Conclusion

For the reasons stated herein, MCL's motion for summary judgment [60-1] is granted in part and denied in part. Intercontinental's motion to strike certain portions of MCL's statement of facts is denied. The court strongly encourages all parties to this lawsuit, including AMC, to discuss settlement, whether it be with or without the assistance of the magistrate judge.

Date: **April 11, 2008**              _____
                                      **Blanche M. Manning**
                                      **United States District Judge**