# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **American Multi-Cinema, Inc.,** | ) | |
| Plaintiff/Counter-Defendant, | ) | |
| | ) | |
| **v.** | ) | **No. 06 C 63** |
| | ) | **Judge Blanche Manning** |
| | ) | |
| **Intercontinental River East, L.L.C.,** | ) | |
| Defendant/Counter-Plaintiff. | ) | |


## MEMORANDUM AND ORDER

On March 3 and 4, 2010, the court conducted a bench trial on the issue of the parties' intent in negotiating AMC's lease at 322 East Illinois Street (the "Building"). Defendant Intercontinental is the current landlord of the space being leased by AMC while defendant MCL was the prior landlord which negotiated the Lease. AMC filed a complaint seeking a declaratory judgment that, under the lease, it was not responsible for paying for heated and chilled water used to heat and cool its space outside of a monthly common expense charge, which is capped. Intercontinental has filed a counterclaim asking that the court declare that AMC is responsible for paying for all utility charges associated with its use of heated and chilled water based on the relevant lease provisions. For the reasons stated below, the court denies AMC's motion for a declaratory judgment and finds that Intercontinental is entitled to prevail on its counterclaim for breach of contract.

The following constitutes the court's Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52. *See* Fed. R. Civ. P. 52(a)(1). To the extent any of the Findings reflect legal conclusions, they shall be deemed Conclusions, and vice versa. For the reasons set forth below, the court enters judgment in favor of Intercontinental and against AMC.

## A. Findings of Fact

In July 1999, AMC, a theatrical film exhibition company, entered into a lease agreement for a theater and related space in the commercial property development commonly known as River East Center in Chicago, Illinois (the "Project") with the then landlord River East, L.L.C. On July 7, 1999, the parties executed the document entitled Lease Between River East, L.L.C., as Landlord, and American Multi-Cinema, Inc., as Tenant, Covering Premises in River East Center I, Chicago, Illinois. ("Lease"). Lease negotiations occurred over an approximately one-year period, culminating in the July 7, 1999, Lease.

Both AMC and River East were represented by counsel during the negotiations. AMC

was represented by Peter DiGiovanni and River East was represented by Richard Traub.[1]  The parties to the Lease, through counsel, exchanged multiple drafts of the Lease before reaching a final agreement. Section 42 of the Lease states in part, ". . . In any interpretation, construction or determination of the meaning of any provision of this Lease, no presumption whatsoever shall arise from the fact that the Lease was prepared by or on behalf of any party hereto."

From March 2003 to April 2004, AMC's landlord at the River East Center was West Wacker Retail & Garage LLC ("West Wacker").  From April 2004 to January 8, 2006, AMC's landlord at the River East Center was an entity called MCL REC, LLC.  From January 9, 2006, to the present, AMC's landlord at the River East Center has been Intercontinental.  Intercontinental owns the retail portion of the River East Center, which includes not only the AMC theater, but also other stores, restaurants, and an exercise facility.

On January 9, 2006, Intercontinental entered into an Agreement with MCL for the Purchase and Sale of the River East Center as legally described in the Agreement of Purchase and Sale between Intercontinental and MCL ("Purchase Agreement").  As a part of the Purchase Agreement, MCL assigned its interest in the AMC Lease to Intercontinental pursuant to an assignment of leases in the Purchase Agreement.  AMC was and continues to be a tenant at the property at River East Center pursuant to the AMC Lease.

The hot and chilled water provided to the retail tenants, including AMC, at the River East Center is produced by a central system (the "Central System") which is owned by Embassy Suites Hotel, which is, in turn, owned by Host Hotels & Resorts, Inc. (collectively the "Hotel").  The Lease provides that "'Central System' shall mean the plant (including rooftop cooling towers) which produces heated and chilled water for Tenant's heating, ventilating and air conditioning system."  The Central System produces heated water and chilled water for use in the heating and cooling of AMC's Theatre and delivers that water to the AMC's Theater penthouse mechanical equipment room.

The Hotel charges Intercontinental for the hot and chilled water attributable to Intercontinental's retail tenants' space. When MCL was AMC's landlord, the Hotel charged MCL for hot and chilled water usage and MCL issued monthly invoices to AMC for its hot and chilled water charges.  Since becoming landlord at the River East Center, Intercontinental continues to issue monthly invoices to AMC for its hot and chilled water charges.  From January 2006, when Intercontinental became AMC's landlord, through June 2008, AMC has been invoiced for the amount of $1,043,412.30 for hot and chilled water usage charges.  AMC has objected to these charges.

---

[1]As noted in the parties' joint statement filed on July 19, 2010, Traub negotiated the Lease on behalf of River East, LLC, which was a predecessor in interest to and part of the various entities owned by Daniel McLean under the umbrella of the corporate name "MCL Companies."

AMC and the defendants dispute whether the Lease requires AMC to pay a separate charge for its usage of hot and chilled water or whether the expense is included in and capped by the "Common Facilities Expense" provisions in the AMC Lease. The Lease provisions at issue are as follows.

Section 12(A) of the Lease reads:

> *Tenant shall pay all charges for gas, electricity, domestic water sewer service and other utilities used in Tenant's Facility during the term hereof (including heated and chilled water)* all such utilities to be separately metered and (except for the heated and chilled water) to be obtained by Tenant from the applicable utility company; PROVIDED, HOWEVER, Landlord shall be solely responsible for the payment of any connection, tap, hookup or other fee(s) imposed by Governmental Authority or by any utility company to extend and/or connect utility service to Tenant's Facility.

AMC Ex. 1, Lease, p. 22 (emphasis added). As explained in more detail below, Intercontinental relies primarily on this section of the Lease in support of its interpretation that AMC is responsible for the costs of the hot and chilled water it uses.

On the other hand, AMC points to the Section 12(C) of the Lease as well as Section 3 of the Rent and Expense Rider in support of its position. Section 12(C) of the Lease provides:

> *Tenant shall tie into the Central System and Landlord shall operate the Central System in a first class and efficient manner so as to continually provide to Tenant's Facility heated and chilled water per the following specifications*: supply and return piping (valved and capped) stubbed into the theatre penthouse with 8" chilled water piping providing 500 ton capacity, 750 gpm at 44 degrees F supply, and 60 degrees F return temperature and 4" heated water piping providing 4,300 MBH capacity, 215 gpm at 180 degrees F supply, and 140 degrees F return temperature. BTU metering shall be provided by Landlord. *The costs of operating and maintaining the Central System shall be included in the Common Facilities Expense, as more particularly set forth in the Rent and Expense Rider*.

AMC Ex. 1, Lease, p. 22 (emphasis added).

Section 3 of the Rent and Expense Rider to the Lease is referenced in Section 12(C) and states:

> (A) **"Common Facilities Expense"** shall mean Landlord's actual, competitive costs of insuring the improvements comprising Landlord's Building (other than trade fixtures and personal property of the occupants thereof), and of maintaining, repairing, lighting, protecting and securing the Common Facilities, including those incurred for the general maintenance and repairs; maintenance and repair of

sidewalks, curbs and gutters; maintenance of planting and landscaping (excluding initial planting and landscaping and any replanting and relandscaping in excess of the quantity or quality of the initial landscaping); lighting and other utilities; *the cost of operating and maintaining the Central System*; directional signs and other markers; personnel to implement such services; adequate public liability insurance on the Common Facilities (under which Tenant shall be named as an additional insured), loss of rents insurance on the rents payable by the occupants of Landlord's Building and the insurance carried by Landlord under Article 16(A); and an administrative fee to reimburse Landlord for the costs of operating and administering the Common Facilities in an amount equal to 10% of the other Common Facilities Expenses (the "Administrative Fee"), excluding, however, from the calculation of such Administrative Fee the cost of insurance premiums and utilities. The term "Common Facilities Expense" shall not include (i) any cost of administration or management (except the "Administrative Fee" described above); (ii) depreciation of the Common Facilities or any equipment (other than mobile maintenance equipment) used in connection therewith; (iii) any item properly chargeable to capital account under generally accepted accounting principles, including the original cost of constructing the Common Facilities or any addition thereto, or replacement or remodeling thereof, unless such capital expenditures amortized without interest over the useful life thereof in accordance with generally accepted accounting principles, in which case, the Common Facilities Expense may include the amortized component of such capital expenditure for such year; (iv) the costs of removing any trash created by the operation of any tenant or occupant of the Project, other than the costs to police litter within the Common Facilities; (v) the costs incurred by Landlord to comply with the provisions of paragraphs (A) or (F) of the Article captioned "Governmental Compliance" or the costs incurred by reason of a breach of any representation or warranty set forth in paragraph (C) or (D) of such Article; (vi) the costs of correcting defects in the design or construction of the Project or any part thereof, or repair and/or replacement of any of the original materials or equipment required as a result of such defects; (vii) any increased expense resulting from the negligence of Landlord, its agents, servants or employees; (viii) the cost of any repair to remedy damage cause by or resulting from the negligence of any other tenant(s) in the Project, including their agents, servants or employees, to the extent Landlord receives a recovery therefore; (ix) reserves for anticipated future expenses; (x) legal and other fees, leasing commissions, advertising expenses and other costs incurred in connection with development or leasing of the Project, or in connection with negotiations or disputes with tenants, occupants or prospective tenants or occupants, or legal fees incurred in connection with the Lease; (xi) expenses incurred in build out, renovation, improvement, decoration, painting or redecoration of space for any other occupant of the Project; (xii) expenses in connection with services or other benefits of a type which are not provided Tenant but which are provided only to or for another tenant or occupant of the Project; (xiii) any interest, late charges, or penalties incurred as a result of

Landlord's failure to pay any bill as the same shall become due; (xiv) any costs of representing an amount paid to a person, firm, corporation or other entity relating to Landlord which is in excess of the amount which would have been paid in the absence of such relationship; (xv) the costs of acquiring sculptures or other art objects and costs of decorative monuments; (xvi) any costs to clean up or repair the Common Facilities as a result of construction, maintenance, or reconstruction of improvements in the Project; (xvii) costs incurred by Landlord as a result of any claim to the extent covered by the insurance which Landlord is required to maintain under this Lease; (xviii) any costs to promote or advertise the Project; and (xix) costs incurred by Landlord with respect to (or attributable to) either of the Parking Facilities, or the Hotel or the Apartment Tower. To the extent the Central System serves the Parking Facilities, Hotel or Apartment Tower, the expenses of operating and maintaining the Central System shall be equitably allocated between Landlord's Building and such other components (based on relative consumption of the Central System media), and the Common Facilities Expense shall include only that portion of such costs of operating and maintaining the Central System as are reasonably allocable to Landlord's Building. Tenant shall pay Landlord in each Lease Year an amount ("Tenant's Common Facilities Contribution") equal to the Common Facilities Expense for such Lease Year multiplied by the "Proration Fraction"; PROVIDED, HOWEVER, in no event shall Tenant's Common Facilities Contribution for the first Lease Year exceed $150,000.00, and in any Lease Year thereafter be more than 5% greater than Tenant's Common Facilities Contribution paid by Tenant for the preceding Lease Year. The "Proration Fraction" shall mean a fraction, the numerator of which is the TF Floor Area and the denominator of which is the Floor Area of Landlord's building, including the TF Floor Area. Tenant shall pay Tenant's Common Facilities Contribution in monthly installments on the first day of each calendar month, in advance, in an amount the first Lease Year equal to $150,000.00 per annum, and thereafter on the basis of Tenant's Common Facilities Contribution for the preceding Lease Year, subject to the year end adjustment described in Paragraph (B).

AMC Ex. 1, Lease, Rent and Expense Rider, pp. R-6-R-7, Section 3.

Section 2 of the Lease reads:

"Common Facilities" shall include all parking areas, including the Parking Facility, driveways, curb cuts, access facilities, aisles, sidewalks, elevators (including those providing access between the Parking Facility and Tenant's Facility), landscaped areas, sanitary and storm sewer lines, water, gas, electric, telephone and other utility lines, systems, conduits and facilities (excluding any such lines, systems, conduits and facilities which exclusively serve a single occupant), service and emergency exit corridors, and other common and service areas within or serving Landlord's Building, whether or not shown on the Floor

Plans. Common Facilities shall not include any areas within the Hotel or the
Apartment Tower.

*See* Exhibit A at p. 3, Section 2.

Section 42 of the Lease also states that, "[c]aptions throughout this instrument are
for convenience and reference only and the words contained therein shall in no way be deemed
to explain, modify, amplify or aid in the interpretation or construction of the provisions of the
Lease. AMC Ex. 1, Lease, p. 56, Section 42.

The Declaration of Easements and Operating Requirements for the River East
Center, which governs the relationship between the Landlord and the Hotel, provides that, "[t]he
costs associated with the hot and chilled water supplied to the Retail Parcel [the Retail
Component] will be included in the BTU charges for the retail Parcel's use thereof as monitored
by the meters." The Hotel charges Intercontinental for hot and chilled water produced by the
Central System and used by the Retail Component.

The Hotel engaged Ernst & Young in 2004 to create a formula for billing Central System
costs to the Building's tenants. The Hotel adopted the Ernst & Young Formula and sends
Intercontinental a monthly bill setting forth the charges attributable to the Landlord for the Retail
Component's use of heated and chilled water received from the Central System. The Hotel
continues to use the Ernst & Young Formula to calculate heated and chilled water charges.

**B.      Conclusions of Law**

1.      Background

The parties dispute who is responsible for the costs of the heated and chilled water that
AMC receives from the Central System for use in the theater's heating and cooling system.
Intercontinental argues that the court need not look beyond Section 12(A) of the Lease, which
Intercontinental asserts requires AMC to pay "all charges" for heated and chilled water. Lease,
Section 12(A)(AMC shall pay "*all charges* for gas, electricity, domestic water, sewer service and
other utilities used in Tenant's Facility during the term hereof (*including heated and chilled
water*). . . ." (emphasis added). Based on this language, Intercontinental contends that AMC
must pay *all* of the heated and chilled water charges billed to it by Intercontinental.

AMC acknowledges that Section 12(A) requires to pay for the heated and chilled water it
receives from the Central System. However, AMC contends that other Lease sections specify
how AMC is to pay for the heated and chilled water. In particular, AMC contends that both
Section 12(C) of the Lease and Section 3 of the Rent and Expense Rider require that all costs of
operating and maintaining the Central System, including the provision of heated and chilled
water, are to be included in the Common Facilities Expense. Specifically, Section
12(C)(emphasis added) states that:

Tenant shall tie into the Central System and Landlord shall operate the Central System in a first class and efficient manner so as to continually provide to Tenant's Facility heated and chilled water per [certain] specifications. . . . *The costs of operating and maintaining the Central System shall be included in the Common Facilities Expense, as more particularly set forth in the Rent and Expense Rider.*

In turn, Section 3 of the Rent and Expense Rider states that "Common Facilities Expense" shall mean "Landlord's actual, competitive costs of insuring the improvements comprising Landlord's Building . . . and of maintaining, repairing, lighting, protecting and securing the Common Facilities, including . . . the cost of operating and maintaining the Central System . . . ." AMC's position is that "the cost of operating and maintaining the Central System" includes the utilities used in creating the heated and chilled water. Based on its interpretation of these provisions, AMC asserts that it is obligated to pay for the heated and chilled water costs only as part of its annual Common Facilities Contribution, which is capped at $150,000 and can be increased no more than 5% a year.

Earlier in this litigation, the parties filed cross-motions for summary each contending that the plain language of the contract supported its position. The court disagreed, finding that the contract language was ambiguous. Under Illinois law, "[i]f . . . the trial court finds that the language of the contract is susceptible to more than one meaning, then an ambiguity is present" and "[o]nly then may parol evidence be admitted to aid the trier of fact in resolving the ambiguity." *Air Safety, Inc. v. Teachers Realty Corp.*, 706 N.E.2d 882, 884 (Ill. 1999)(internal citations omitted). Thus, the court denied the cross-motions for summary judgment and conducted a bench trial to allow the parties to present parol evidence as to what the parties intended when they drafted the contract.

2.     The parties' positions

On the one hand, AMC asserts that it purposely negotiated the Lease provisions to cap its exposure for paying Central System costs.

As noted above, Peter DiGiovanni represented AMC in its Lease negotiations while Richard Traub represented River East, L.L.C, the original landlord. In the instant case, AMC initiated the negotiations by sending River East AMC's standard form lease. At an initial meeting, AMC indicated that it wanted to operate its own rooftop heating and cooling equipment. According to AMC's lawyer who negotiated the Lease, "AMC is like most other large anchor tenants. They want their own rooftop equipment because they feel that tying into a landlord's central system is more expensive than if they had their own rooftop units." DiGiovanni, Trans. at 60-61. However, the landlord stated that such an arrangement was "not feasible" for engineering and aesthetic reasons.

In January 1999, DiGiovanni circulated a draft Rent and Expense Rider which included a separate HVAC charge that AMC would pay if it were to tie into the Central System.

Specifically, Section 4 of the proposed Rent and Expense Rider was entitled "HVAC Charge" and states in part: "[i]n order to partially compensate Landlord for the cost of operating the Central System, Tenant shall pay Landlord in each Lease Year an amount (the "HVAC Charge") equal to the product obtained by multiplying the "HVAC Cost" by the Proration Fraction. . . ." Intercontinental Trial Exh. 19 at R-7 (Bates AMC00665). "HVAC Cost" was subsequently defined to mean "Landlord's actual out of pocket cost of utilities and supplies incurred to operate the Central System." *Id.* at R-8, Section 4(C). Thus, AMC's proposed payment of a separate HVAC Charge included the Landlord's "out of pocket utilities . . . incurred to operate the Central System," and "the cost of operating the Central System" was not included as part of the Common Facilities Expense. In February 1999, AMC sent a revised Rent and Expense Rider in which the separate HVAC Charge was deleted and the "cost of operating and maintaining the Central System" was added as part of the Common Facilities Expense. This revised language is what appears in the final version of the executed Lease including the Rent and Expense Rider.

According to AMC, the insertion of the term "cost of operating the Central System" as part of the Common Facilities Expense simply substituted for the deletion of the separate "HVAC Charge" in the Rent and Rider Expense and demonstrates that the parties' intent was to include the Landlord's out of pocket utility costs in the "cost of operating and maintaining the Central System," which was capped as a Common Facilities Expense.

Intercontinental, on the other hand, argues that the lawyer who negotiated the Lease on behalf of the landlord, Richard Traub, testified that it was his understanding that utility charges related to the heated and chilled water would be separately billed and paid for pursuant to Section 12(A) of the Lease. As to Section 12(C) of the Lease, with respect to the phrase "the cost of operating and maintaining the Central System shall be included in the Common Facilities Expense as more particularly set forth in the Rent and Expense Rider," Traub testified that his understanding was as follows:

> [My] understanding was that the central system was the physical plant that provided the hot and chilled water to the premises, in addition to other premises, and that the costs such as, for example, operating, if someone was to attend to that plant and was checking on the plant, that cost was not a utility charge and would be payable under 12(C). That maintaining, for example, if a pipe burst and that pipe needs to be repaired, you'd repair and maintain the physical plant under 12(C), and that cost would be included under 12(C).

Trial Trans. at 136.

Traub further testified that he never understood that the charges under Section 12(A), which he termed "utility charges," *see* Trans. at 137, ll. 2-3, to be the same as the "costs of operating and maintaining the Central System" as stated in Section 12(C). He further testified that DiGiovanni, AMC's lawyer, never told him that the costs of operating and maintaining the Central System included the gas, electric, and water charges from the utility companies for the heated and chilled water. Moreover, Traub stated that DiGiovanni never told him that the gas,

electric, and water charges from the utility companies for the heated and chilled water that AMC used were included in the Common Facilities Expense or that they could not be charged to AMC. *Id*.

In additional support for its position, Intercontinental notes that Charles Landefeld, a principal at MCL who was involved in the Lease negotiations, testified that "the discussions for the most part were that it would be AMC's responsibility to pay for their hot and chilled water consumption" and "[t]hat there would be BTU meters installed to monitor the amount of consumption that was attributable to AMC and they would be billed for that." Landefeld Dep. at 117.

Based on the testimony and documentary evidence presented by the parties, the court concludes that Intercontinental's reading of the Lease is correct–that is, that AMC is responsible for paying the separately metered charges for the heated and chilled water it uses from the Central System.

In reaching this conclusion, the court is guided by certain principles of contract interpretation. First, the court has considered the plain language and the context of the disputed provisions. Section 12(A) of the Lease, entitled "Utilities," states that "Tenant shall pay all charges for gas, electricity, domestic water, sewer service and other utilities used in Tenant's Facility during the term hereof (including heated and chilled water) all such utilities to be separately metered and (except for the heated and chilled water) to be obtained by Tenant from the applicable utility company. . . ." Alternatively, Section 12(C) states that the "costs of operating and maintaining the Central System shall be included in the Common Facilities Expense, as more particularly set forth in the Rent and Expense Rider." Section 3 of the Rent and Expense Rider is entitled "Common Facilities Expense" which means "Landlord's actual, competitive costs of insuring the improvements comprising Landlord's Building (other than the trade fixtures and personal property of the occupants thereof), and of maintaining, repairing, lighting, protecting and securing the Common Facilities, including. . . the costs of operating and maintaining the Central System . . . ." In turn, "Common Facilities" is defined in the Lease as including:

> all parking areas, including the Parking Facility, driveways, curb cuts, access facilities, aisles, sidewalks, elevators . . . , landscaped areas, sanitary and storm sewer lines, water, gas, electric, telephone and other utility lines, systems, conduits, and facilities (excluding any such lines, systems, conduits and facilities which exclusively serve a single occupant), service and emergency exit corridors, and other common and service areas within or serving Landlord's Building, whether or not shown on the Floor Plans.

The plain reading of the definition of "Common Facilities" discusses only common and service areas and expressly excludes certain items "which exclusively serve a single occupant." Thus, AMC's position that "costs of operating and maintaining the Central System," as included in the Common Facilities Expense, includes utility costs attributable only to its own use of heated

Page 9

and chilled water, wholly contradicts the plain language of the "Common Facilities" definition.

Further, Section 12(A) expressly states that the tenant shall pay "all charges" for "utilities used in Tenant's Facility during the term hereof (*including heated and chilled water*)." Section 12(A)(emphasis added). The statement is not qualified nor does Section 12(A) expressly cross-reference Section 12(C) or even use the same language used in Section 12(C) such that an objective reader would understand that the cap on the "costs of operating and maintaining the Central System" would apply to Section 12(A). Thus, the plain language of 12(A) supports the court's conclusion.

Moreover, as recently noted by the Seventh Circuit, "Illinois law avoids interpretations that render a contract inequitable, unusual or such as reasonable men would not be likely to enter into." *Curia v. Nelson*, 587 F.3d 824, 831-32 (7th Cir. 2009)(citations and internal quotation marks omitted). In addition, "[o]ne thing to consider is the consequences of alternative interpretations. Suppose that the result of reading a contract in a particular way is that one of the parties assumed enormous risks and got nothing in return; this would argue against the reading." *Id.* (citation and internal quotation marks omitted). Here, under AMC's reading, River East (and therefore, Intercontinental) assumed the risk of paying for years of unlimited utility costs for providing heated and chilled water to AMC, but AMC fails to identify what, if anything, River East received in return. AMC notes that other financial terms changed during the parties' negotiations and argues that "[i]t is perfectly plausible that a capped limit on Common Facilities Expense, including Central System costs, would be the product of the parties' negotiations." AMC Reply at 21, Dkt. #191. *See also* Reply at 26 ("Some Lease terms, such as the rent and construction allowance, became more favorable to AMC; other terms, such as the amount of real estate taxes paid, became more favorable to the Landlord. It is a reasonable conclusion that, as part of the bigger picture of these negotiations, AMC negotiated a cap on Central System expenses.").

While it may be a plausible or reasonable conclusion, AMC offers no evidence that this is what actually happened. AMC has failed to point to any specific evidence indicating that River East affirmatively agreed that the utility costs for providing heated and chilled water from the Central System (which from January 2006–when Intercontinental became the Landlord---through May 2009 total over $1.1 million) would be included as part of the capped Common Facilities Expense in exchange for other concessions by AMC.[2]

In addition, the court notes that it is not persuaded by AMC's attempts to rely on the Ernst & Young report as well as American Society of Heating, Refrigerating and Air-

---

[2]Indeed, as noted by Intercontinental, AMC already has benefitted from the capped Common Facilities Expense, without even taking into account the utilities for heated and chilled water. For example, AMC's 2006 share of the Common Facilities Expense, excluding any amount for the heated and chilled water, was $505,897.53, but due to the contractual cap, AMC paid only $162,830.91. The numbers are similar for 2007 and 2008.

Conditioning Engineers ("ASHRAE") standards to support its interpretation of the Lease. Specifically, AMC notes that both an outside report prepared for the Hotel in 2005 by Ernst & Young and ASHRAE standards characterize utility costs as "operating costs" related to providing heated and chilled water for use in heating, ventilation, and air-conditioning systems. According to AMC, then, the term "costs of operating and maintaining the Central System" should be interpreted to include the utility costs related to providing the heated and chilled water from the Central System, which would be capped as a Common Facilities Expense. It is true that, under Illinois law, "[w]here the agreement at issue is capable of being understood in more than one sense, 'evidence of extrinsic facts and circumstances' is necessary to determine the intent and agreement of the parties." *Brandon Apparel Group v. Kirkland and Ellis*, 7 N.E.2d 748, 758 (Ill. App. Ct. 2008)(citation omitted). However, AMC again fails to establish that the information contained in the Ernst & Young report and the ASHRAE standards affected the intent or agreement of the parties. The record simply contains no indication that the parties knew about or used this information when negotiating the Lease.

AMC argues otherwise, pointing to testimony from MCL's attorney, Richard Traub, in which he agreed with AMC's counsel's statement that electricity, gas, and maintenance are necessary "costs to operate the Central System." *See* AMC Reply at 25, Dkt. #191 (quoting Trial Tr. pp. 145-146). But simply because Traub agreed at trial in 2010 that certain costs are necessary to operate the Central System does not mean that the parties intended in a 1999 lease that the phrase "costs of operating and maintaining the Central System" necessarily included all of the utility costs required to operate the Central System. As is well-established, contracts must be read as a whole and noticeably absent from AMC's counsel's questions regarding the operating costs of the Central System was any reference to Section 12(A) of the Lease, which states that "Tenant shall pay all charges for gas, electricity, domestic water sewer service and other utilities used in Tenant's Facility during the term hereof (including heated and chilled water)." Accordingly, AMC's counsel's questions, which were posed in a vacuum without reference to other relevant provisions of the Lease or the intent of the parties at the time the Lease was drafted, fail to provide any insight to the issue at hand.

Finally, AMC's reference to DiGiovanni's revisions to the Lease is unpersuasive. As noted above, AMC places significance on the fact that its attorney, DiGiovanni, attempted to add a section to the Lease called "HVAC Charge" which included an "HVAC Cost" defined as "Landlord's actual out of pocket cost of utilities and supplies incurred to operate the Central System." DiGiovanni testified that Intercontinental rejected the "HVAC Charge" and "HVAC Cost" language and in it place, the phrase "costs of operating and maintaining the Central System" was added to the Common Facilities Expense. According to AMC, this substitution demonstrates that the parties intended that the utility costs for the heated and chilled water were to be included in the "costs of operating and maintaining the Central System."

However, the court does not find this to be a reasonable explanation for the change in light of the testimony of MCL's lawyer who negotiated the Lease, Richard Traub, whom the court found credible. Specifically, as discussed above, Traub testified that it was his understanding that AMC's usage of heated and chilled water was to be metered and that it was to

pay separately for all of its heated and chilled water charges. He testified that he was never told by DiGiovanni that the "costs of operating and maintaining the Central System" included the utility charges for providing the heated and chilled water to AMC's space. Traub's testimony is supported by the deposition of Charles Landefeld, as discussed above. Morever, Intercontinental Trial Exhibit 15,[3] which is a June 12, 1998, letter from Landefeld to DiGiovanni, Landefeld states that "[b]oth the chilled and hot water [from the central plant] would be BTU metered so that *AMC would pay only when cooling or heating is being performed*." Intercontinental Trial Exh. 15 (emphasis added). In a March 12, 1999, letter from DiGiovanni to Doug Seibert at AMC, DiGiovanni states he is enclosing the "HVAC specifications for the Central System provided by Charles Landefeld." The attached specification states as follows:

> . . . heated and chilled water to the following specifications: supply and return piping (valved and capped) stubbed into the theatre penthouse with 8" chilled water piping providing 500 ton capacity, 750 gpm at 44 degrees F supply, and 60 degrees F return temperature and 4" heated water piping providing 4,300 MBH capacity, 215 gpm at 180 degrees F supply, and 140 degrees F return temperature. *BTU metering shall be provided by Landlord.*

Intercontinental Trial Exh. 20, AMC00118 (emphasis added).[4] Thus, as late as March 1999, after approximately 9 months of negotiations, Landefeld continued to include a provision regarding BTU metering being provided by the Landlord for the purpose of billing AMC for its use. Indeed, this provision, including the wording about the BTU metering, was included in the final version of the Lease.

AMC also includes a section in its brief arguing that the depreciation and administrative charges that are part of the monthly utility bills sent by Intercontinental to AMC for heated and chilled water are not chargeable to AMC because the Common Facilities Expense section in the Rent and Expense Rider expressly excludes these items. However, as Intercontinental notes, the administrative and depreciation charges are not being included in the Common Facilities Expense. Accordingly, AMC's position is inapposite.

---

[3]Intercontinental Trial Exhibit 15 is referenced in Alan Benjamin's deposition, as designated by both parties at pages 44-45. To the extent that AMC has objected to this exhibit on the ground that it violates the parol evidence rule and the four corners rule, this objection is overruled based on the court's previous determination that the Lease was ambiguous and therefore, the court would admit parol evidence as to the parties' intent. In addition, the court overrules AMC's relevance objection on the ground that the court concludes the exhibit is relevant to the issue at hand.

[4]Intercontinental Trial Exhibit 20 is referenced in Alan Benjamin's deposition, as designated by Intercontinental at pages 84-85. It is also referenced in DiGiovanni's deposition as designated by Intercontinental at page 74. AMC's objections to Exhibit 20 are overruled for the same reasons as stated in footnote 2 as to Exhibit 15.

## C.      Conclusion

For the reasons stated above, the court concludes that the parties intended for AMC to pay all charges for its heated and chilled water as metered and separately billed, and that the charges are not part of the capped Common Facilities Expense.  Accordingly, AMC's motion for declaratory judgment is denied and Intercontinental's counterclaim for breach of contract is granted in an amount equal to the heated and chilled water charges to date as detailed in the Lease.  In addition, pursuant to Section 37(B) of the Lease, Intercontinental is awarded reasonable attorney's fees and other applicable expenses incurred in pursuing this lawsuit.  This case is terminated and the clerk is directed to enter a Rule 58 judgment in Intercontinental's favor.

**ENTER:**

**DATE:** August 10, 2010    _Blanche M. Manning_
**Blanche M. Manning**
**United States District Court Judge**